**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KEITH M. CAPERS, | : | |
| | : | Civil Action No. 05-1567 (NLH) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GRACE ROGERS, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

KEITH M. CAPERS, Petitioner <u>Pro</u> <u>Se</u>
SBI #2409B
East Jersey State Prison
Lock Bag R
Rahway, New Jersey 07065

ROBIN A. HAMETT, ESQ.
Assistant Prosecutor
Camden County Prosecutor's Office
25 North Fifth Street
Camden, New Jersey 08102
Counsel for Respondents

**HILLMAN**, District Judge

This matter is before the Court on Petitioner Keith M.

Capers' petition for habeas corpus relief under 28 U.S.C. § 2254.

For reasons discussed below, the petition for habeas corpus

relief will be denied for lack of merit.

## I.   BACKGROUND

### A.   Statement of Facts

The facts of this case were recounted below and this Court,
affording the state court's factual determinations the
appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply
reproduce the Appellate Division's factual recitation, as set
forth in its May 1, 2003 per curiam Opinion on petitioner's
direct appeal from his conviction:

> The trial record reveals the following relevant facts
> concerning the convictions.  On June 10, 1999, defendant
> called his aunt, Y.J., from the Woodcrest speedline station
> and asked her to pick him up.  Y.J. agreed, and the two
> spent an uneventful day alone together at her house.  After
> dinner, defendant informed Y.J. that he was feeling tired
> and, at Y.J.'s invitation, he went upstairs to rest in her
> son's room.  Shortly thereafter, Y.J. went to her own
> bedroom and prepared for bed.
>
> No sooner than she had put on her nightgown, defendant "came
> crashing" through Y.J.'s bedroom door and told her that she
> was "not going to get away from [him]."  He then knocked
> Y.J. down with a pillow, forcing it over her face and
> telling her that he was going to take care of [her] right
> now."  Y.J. testified that she "felt like [she] was going to
> die because [she] couldn't breathe at all."
>
> At this point, defendant began punching Y.J. on the left
> side of her face, kicking her in her ribs, and punching her
> in her chest and back.  Defendant then took out a cord and
> stated that he was "going to get [her] now" and "choke [her]
> to death" by "ma[king] a noose around [her] neck," but he
> was unable to make the noose.
>
> Y.J. tried to escape by running out the door, but defendant
> held her back and told her, "[y]ou're asking for it now, you
> know."  Defendant then "got [Y.J.] down on the bed" and
> threatened "to kill [her]."  When Y.J. stated "no, Michael,
> don't do that," defendant responded, "it's Barry, not
> Michael."  Defendant then informed the victim that he was
> going to "cut [her] nipples off," and simulated this act

2

with an imaginary knife.  Defendant then bit Y.J.'s nipples, and "took his hand ... and thrust [it] in [Y.J.'s] vagina ... all up to [her] stomach."  Immediately afterward, defendant "turned [Y.J.] over on [her] side" and said she was "going to get it from the back now," at which time he "took his hand and put it up [her] rectum as far as he could [go]."  Defendant then opened the zipper of his pants, and without taking his penis out, began simulating sexual intercourse and growling as he lay on top of the victim. Defendant again threatened to kill Y.J.

Thereafter, defendant tied up Y.J.'s feet and hands with some rags and forced her to drink whiskey and beer, as he did the same.  Defendant then dragged Y.J. into her son's bedroom, causing abrasions to her neck and shoulder.  Once the two were in her son's bedroom, he hit her repeatedly with a seven to eight inch weight which belonged to her son.

While in her son's bedroom, defendant "started the same sexual abuse that he did in the other room," inserting his hand into Y.J.'s vagina and rectum.  He then tore off Y.J.'s nightgown and "continued abusing [her] with the alcohol" by "hitting [her] mouth and trying to get it in [her] face." At this point, Y.J. threw up.  Thereafter, defendant blindfolded Y.J. and fell asleep on her son's bed. Y.J. remained awake and tied up next to defendant all night.

In the morning, defendant took the bedding off of the bed he had slept on and went downstairs to wash it.  Upon returning, he untied Y.J. but put a new tie on her wrist so that she could not "get away from [him]."  After Y.J. was again unsuccessful in attempting to escape, she told defendant that she had to go to a doctor's appointment scheduled for 11:00 a.m.  In response, defendant told Y.J. that she could drop him off at the speedline station.  Upon their arrival there, defendant left the car and informed Y.J. that Y.J.'s sister, his mother, "is going to be next." Defendant then left, and thus the ordeal ended.

After returning from the station, Y.J. immediately went to the nearby house of Bertram and Delores Moore, her neighbors of thirty years.  Y.J. was black and blue all over and her eyes were bloodshot.  She told the Moores that defendant had "brutalized [her] all night long and ... abused [her]," raped her, and tied her up.  The Moores summoned the police and an ambulance, and Y.J. was taken to Cooper Hospital. There, a rape examination was performed by Christine Nicolo, an emergency room nurse and "sexual assault nurse examiner."

. . .

Nurse Nicolo testified that the victim initially presented as "traumatized," "upset and tearful." The nurse stated that Y.J. "Was lying on [a] stretcher with a C-collar and a backboard," and she remained in that state until CAT scan and x-ray results came back negative. Y.J. "looked like she was brutally beaten," with a swollen face and "black and blues and [a] disheveled look." She was "grossly edematous, which is swollen, very swollen," and had "scleral hemorrhage ... broken blood vessels in the right part of [her] eye" and "a dark purple ecchymotic" off to the left corner of [her] eye," "which is also a black and blue mark." Her nose was bruised and red. There was "a very large abrased area" and "streak marks" on her back. Further, "dark purple areas" surrounded her nipples. In addition, there was a bruise "on her stomach, lower pelvic area."

There was "[r]edness to the ... labia" of the victim, and her clitoris was "extremely reddened." Finally, there was "redness and mild swelling ... around" the victim's rectal area, but no internal trauma. Nurse Nicolo also testified that after the examination took place, Y.J. was too distraught to be released and was admitted to the hospital.

Meanwhile, on June 11, 1999, Detective Thomas Riddle and Officer Brian Robinson of the Cherry Hill Police Department searched for defendant, for whom there were active warrants. At approximately 5:00 p.m., they learned that defendant had been arrested by the Pennsauken Police Department, and taken to the Cherry Hill Police Station, where defendant was being held in a twelve by twelve interrogation room. Defendant was read his Miranda rights by Detective Riddle, which defendant acknowledged by signing a card reflecting that he had been advised of his rights.

Upon being questioned, defendant admitted that he had been at the victim's house on the date of the incident, but denied hurting her. After some brief additional questioning, defendant told the policemen that "he did not wish to speak to [them] any longer." At this point, the policemen ended their questioning, which had taken a sum total of ten minutes. During the questioning, defendant's feet were constrained by "leg iron shackles," and his left hand was handcuffed.

Three days later, on June 14, 1999, Sergeant Jim Koslowsky and Investigator Mary Derra of the Camden County

Prosecutor's Office, unaware that defendant had been
interviewed by Cherry Hill police, came to speak with
defendant in the Camden County Jail.  They were in plain
clothes.  They asked defendant if he would come to the
Camden County Prosecutor's Office for an interview, and he
agreed to go.  Upon arriving at the Prosecutor's Office,
defendant was read his <u>Miranda</u> rights and defendant signed a
card acknowledging as much.  As before, his feet were
constrained by "leg iron shackles."  Defendant was offered
food and drink, which he accepted, and was also given breaks
for smoking and lunch.

Testifying with the aid of his notes, Sergeant Koslowsky
stated that defendant had given the following confession
over a period of four hours:

> He said, I already hurt my aunt.  I did a serious
> crime.  I'll do 50 years.  He stated, I owe it to my
> aunt to tell what happened.  He stated, he woke up, he
> looked at his aunt, we were in the bedroom.  He said to
> his aunt, what the hell happened?  She responded, you
> did it, you did this.  He stated, that the house was,
> basically, ransacked, and his aunt stated, you were,
> basically, going crazy.

> He stated that his aunt had said, that she didn't want
> ... to go to the police [] herself.  He stated that the
> victim, his aunt, said she would take care of cleaning
> up the vomit, and that he, himself, put the green
> sheets in the laundry, and that he took the sheets off
> the bed and they had vomit on them.

> He asked her about the bruises and how she was going to
> explain this ...

> He stated that he cleaned up the cereal, the sheets,
> the beer bottles, and his clothes.  He stated that his
> aunt was fully dressed and eating cereal in his
> cousin's bedroom and that is when he awoken.  He stated
> that she was - his aunt was looking in the mirror at a
> black eye, and then he asked her who did it, and she
> stated that he did it, and he said, holy shit.  He told
> her he's getting help now for blackouts that he was
> experiencing.  He said to her, what do we do, and she
> stated to him, go over to Philadelphia.

He stated that his aunt never tried to get away, and while she was dropping him off at the speedline, he asked her if she wanted to go to the police.  She stated, don't worry about it.  He also stated that his aunt only had a black eye.  He also stated that if she wanted to leave, she could have because at some point he had fallen asleep.  He stated she wasn't tied up when he awoke.  He doesn't remember tying her up.  He doesn't think he could have done that.

Then, I had asked him to go back to the beginning of the night.  And he said in the beginning, he smoked a cigar out in front of her house.  He had two beers and two marijuana joints, and after going to bed the first time, he then later woke up between midnight and 1:00 a.m.  He went downstairs.  He got beer and he got vodka mixed with ... Coke, and that he passed out in his cousin's bedroom, and he stated that at that time, his aunt was in her bedroom and that it was only the two of them in the house.

He stated that when he woke up, his aunt said it was something like a nightmare.  He stated that he didn't remember dry humping her, and I explained to him when I had asked that question and this was his response.  I explained that it was not actually having intercourse, it was simulating sexual intercourse.

He didn't deny this but he stated that he doesn't remember.  He stated that if she said I did it th[e]n I did it.  I trust my aunt.  I wouldn't call her a liar. If my aunt said I put my finger in her vagina and rectum, I cannot say my aunt is a liar.  He further stated I can't believe it though.

He said, my aunt did not tell me that I sexually assaulted her.  My aunt told me I messed up her house and bruised her up.  And then I asked the question, if your aunt said you put your finger into her vagina and rectum, is it possible that you did it?  After a pause, he stated, I guess it's possible. ...

At this point in the questioning, the law enforcement officials began making an audiocassette tape of the interview with defendant, which commenced with defendant

6

again being given his <u>Miranda</u> rights.[1]  At some point during the taped portion of the interview, defendant stated, "Could we stop so I - I want an answer to ask - I think I need some legal advice."  Sergeant Koslowsky assertedly did not hear defendant say this, and continued to question him. Defendant again stated that he wanted to talk to a lawyer and that he "need[ed] some legal advice."  At this point, Investigator Derra stopped the interview.

On defendant's motion to suppress his statements, the judge ruled as follows:

> Counsel, first of all with regard to the [<u>State v. Driver</u>, 38 N.J. 255 (1962)] hearing, I'm satisfied that all the voices on the tape can be identified, the device was capable of recording the conversation, it was operated in a competent manner, the recording is authentic and correct, there's been changes, additions, or deletions have been made to the tape (sic), and I'm satisfied and I'll indicate later on whether or not I find the statements were voluntarily given without any inducement.
>
> * * * *
>
> Counsel ... I'm satisfied that on ... June 11[th] the defendant was interviewed by Thomas Riddle of the Cherry Hill Police, Sergeant.  Prior to him questioning him, he was picked up from Pennsauken.  There was no questioning done until they got to the Cherry Hill Police Station.  At that time, the officer indicated that he read to him S-1 for identification, which are the <u>Miranda</u> rights.  He indicated he read them to him ... And I'm satisfied the defendant knowingly and voluntarily ... waived his rights under <u>Miranda v. Arizona</u>[, 384 U.S. 436, S.Ct. 1602, 16 L. Ed.2d 694 (1966)], and agreed to be questioned, he wished to give a statement.
>
> I'm satisfied that any statement he made to Thomas Riddle, the statements concerning that he was alone in the house with [the victim], that ... he did not hurt her, that she left to go with him to Woodcrest [Station] about [1]2:00 p.m., ... I'm satisfied all

---

[1]  The cassette was played at the <u>Driver/Miranda</u> hearing, but its contents are not reproduced in the transcript.

these statements were voluntarily made, and there was a knowing and voluntary waiver of his rights and therefore, I find that they may be presented to the jury.

With regard to the later interrogation at the Prosecutor's Office ...

[Sergeant Koslowsky] indicates those notes - he was trying to write them down verbatim, and that they are as best as humanly possible, word for word what the defendant said.  And I find that prior to that interview, he was also given his Miranda [r]ights, that he signed the statement at 10:58 a.m., and it was witnessed by Marty Derra and ... Sergeant Koslowsky also saw the defendant sign this.

I find that the statements made by the defendant were voluntarily made during this period of time.  There were smoke breaks.  There were also breaks for coffee and soda.  There was a lunch break. ... I find the defendant was not coerced or threatened in any way.  I find that he understood his rights and that he intelligently waived them and wished to give a statement.

With regard to the taped statement, I find, again, that he was given his rights yet a third time on the statement, and I'm satisfied, as I indicated, that the statements that were made were voluntarily made, he knew what his rights are, and he elected to waive them. I'm satisfied, however, as the prosecutor has, basically, conceded, that after page six when the defendant made his statement that he didn't want to say anything that would incriminate him, that at that point what he is saying is questionable, whether or not it would be admissible, and for that reason, the prosecutor is not moving it [in] and, therefore, I find nothing wrong with the statement given by defendant on the tape up to that time.  And I find, therefore, that it may be admissible, as redacted[.]

(Ra13, Appellate Division Opinion, dated May 1, 2003, at pp. 4-13).[2]

---

[2]  Respondents provided the state court record as follows:

8

Ra1   Camden County Indictment No. I-3380-10-99
Ra2   Defendant's Letter Brief, dated May 19, 2000,
      requesting victim's psychological records
Ra3   June 23, 2000 trial court Order compelling the State to
      provide victim's psychological records for in camera
      inspection
Ra4   State's motion for imposition of sentence under the No
      Early Release Act.
Ra5   Judgment of Conviction, dated February 16, 2001
Ra6   Amended judgment of conviction, dated March 13, 2001
Ra7   Defendant/Petitioner's Notice of Appeal, filed May 7,
      2001
Ra8   Defendant/Petitioner's Brief on direct appeal, dated
      March 1, 2002
Ra9   Defendant/Petitioner's Notice of Motion to Appellate
      Division for disclosure of victim's medical records
Ra10  State's opposition to motion for disclosure of victim's
      medical records, dated May 9, 2002
Ra11  Appellate Division's Order, dated May 30, 2002, denying
      motion for disclosure of victim's medical records
Ra12  State's Brief in response to direct appeal, dated
      August 29, 2002
Ra13  Appellate Division Opinion, dated May 1, 2003,
      affirming conviction and sentence on direct appeal
Ra14  Defendant/Petitioner's Notice of Petition for
      Certification to the Supreme Court of New Jersey, dated
      May 16, 2003
Ra15  Supreme Court acknowledgment of receipt of the petition
      for certification, dated May 22, 2003
Ra16  Defendant/Petitioner's notice of motion to file
      petition for certification Nunc Pro Tunc, dated May 30,
      2003
Ra17  Defendant/Petitioner's letter brief in support of
      motion to file petition for certification Nunc Pro
      Tunc, dated May 30, 2003
Ra18  Defendant/Petitioner's letter petition for
      certification
Ra19  State's opposition letter to petition for
      certification, dated June 24, 2003
Ra20  Supreme Court of New Jersey Order denying
      certification, filed July 21, 2003
Ra21  Defendant/Petitioner's pro se motion for post-
      conviction relief ("PCR"), filed November 12, 2003
Ra22  State's opposition brief to PCR motion, filed December
      12, 2005
Ra23  Order denying PCR motion, filed December 16, 2005

B.   Procedural History

Petitioner, Keith M. Capers ("Capers"), was indicted by a Camden County Grand Jury on October 26, 1999, as follows: (Counts 1-8) first degree aggravated sexual assault in violation of N.J.S.A. 2C:14-2a(3); (Count 9) second degree aggravated sexual assault in violation of N.J.S.A. 2C:12-1b(1); (Count 10) third degree aggravated assault in violation of N.J.S.A. 2C:12-1b(7); (Count 11) first degree attempted murder in violation of N.J.S.A. 2C:5-1 and 2C:11-3a; (Count 12) first degree kidnaping in violation of N.J.S.A. 2C:13-1b(1); (Count 13) first degree kidnaping in violation of N.J.S.A. 2C:13-1b(1); (Count 14) third

---

Ra24 Promis Gavel listing in state court proceedings
Ra25 State's letter, dated March 14, 2006, requesting
     expedited transcript of state PCR proceeding

Rta1 Transcript of pretrial hearing on August 4, 2000
Rta2 Transcript of trial on December 5, 2000
Rta3 Transcript of trial on December 6, 2000
Rta4 Transcript of trial on December 7, 2000
Rta5 Transcript of trial on December 12, 2000
Rta6 Transcript of trial on December 13, 2000
Rta7 Transcript of sentencing, dated February 16, 2001
Rta8 Transcript of PCR proceeding, dated December 16, 2005

The following documents were submitted to the Court under seal:

Ra-GJ        Transcript of Grand Jury proceeding on October 19,
             1999
Ra-PSR       Adult Presentence Report, dated December 18, 2000
Ra-PSR/A.D.T.C.     Adult Diagnostic and Treatment Center
                    Evaluation Report, dated January 2, 2001

10

degree criminal restraint in violation of N.J.S.A. 2C:13-2a;
(Count 15) third degree terroristic threats in violation of
N.J.S.A. 2C:12-3b; (Count 16) third degree hindering apprehension
or prosecution in violation of N.J.S.A. 2C:29-3b(1); and (Count
17) fourth degree tampering with or fabricating physical evidence
in violation of N.J.S.A 2c:13-2A.  (Ra1).

Criminal pretrial and trial proceedings were held before the
Honorable Samuel D. Natal, J.S.C., Superior Court of New Jersey,
Law Division, Camden County.  In pretrial proceedings, on August
4, 2000, the trial court denied petitioner's motion for
disclosure of the victim's medical record, after the court had
screened the records in camera.  (RTa1 3:10-4:3).

On December 5, 2000, the indictment was amended on the
State's motion.  First, each count was amended to correct a
typographical error as to the date of the incident, changing the
date from June 1, 1999 to June 10, 1999.  Second, Count 2 and
Count 6, which charged Capers with aggravated sexual assault (by
vaginal and anal penetration) during the commission of a robbery,
were dismissed because the grand jury did not indict petitioner
on robbery charges.  Third, the remaining counts were renumbered
and the charges were amended as follows: (Count 1) first degree
aggravated assault by anal penetration of victim during
commission of aggravated assault or kidnaping, in violation of
N.J.S.A. 2C:14-2a(3); (Count 2) first degree aggravated assault

11

by anal penetration of victim using physical force and causing severe personal injury, in violation of N.J.S.A. 2C:14-2a(6); (Count 3) first degree aggravated assault by vaginal penetration of victim during commission of aggravated assault or kidnaping, in violation of N.J.S.A. 2C:14-2a(3); (Count 4) first degree aggravated assault by vaginal penetration of victim using physical force and causing severe personal injury, in violation of N.J.S.A. 2C:14-2a(6); (Count 5) second degree aggravated sexual assault in violation of N.J.S.A. 2C:12-1b(1); (Count 6) third degree aggravated assault in violation of N.J.S.A. 2C:12-1b(7); (Count 7) first degree attempted murder in violation of N.J.S.A. 2C:5-1 and 2C:11-3a; (Counts 8 & 9) first degree kidnaping in violation of N.J.S.A. 2C:13-1b(1); (Count 10) third degree criminal restraint in violation of N.J.S.A. 2C:13-2a; (Count 11) third degree terroristic threats in violation of N.J.S.A. 2C:12-3b; (Count 12) third degree hindering apprehension or prosecution in violation of N.J.S.A. 2C:29-3b(1); and (Count 13) fourth degree tampering with or fabricating physical evidence in violation of N.J.S.A 2c:13-2A.[3]  (Rta2 at 4:17-16:18; Ra13 at pg. 2).  It should be noted that amended Counts 2 and 4 changed the statutory reference from N.J.S.A. 2C:14-2a(3) to N.J.S.A.

---

[3]   The Counts in the indictment were renumbered because two of the original counts (Count 2 and 6, pertaining to robbery) were actually dismissed from the indictment; and because the original Count 3 and Count 7 were merged into Count 1 and the amended and renumbered Count 3, respectively.

12

2C:14-2a(6) because the charges that petitioner used physical force to cause the victim severe personal injury during the acts of aggravated sexual assault by sexual penetration tracked almost verbatim the language of the latter statute.  Defense counsel had no objection to the amended indictment on these grounds.

A Sands/Brunson[4] hearing also was conducted on December 5, 2000 to determine whether the State could use petitioner's prior first and second degree convictions if he testified at trial. The court granted the State's request, but each conviction had to be sanitized under Brunson.  (Rta2 at 55:7-69:9).  The court then held a Driver/Miranda[5] hearing on Capers' motion to suppress his statement, which was denied.  (Rta2 at 162:16-19).  The court further allowed Capers' redacted taped statement to be admitted up to the point where he declared that he did not wish to incriminate himself.  (Rta2 at 162:11-20).

After the hearings concluded, trial commenced on December 5, 2000.  Petitioner made a motion for acquittal at the close of the State's case, which was denied.  (Rta5 at 12:18-26:5).  On December 13, 2000, the jury returned a verdict of guilty on Counts 1 through 6 and 8 through 11, as amended, and acquitted Capers on Counts 7, 12, and 13.  (Rta6 at 21:12-28:18).

_____

[4]  State v. Sands, 76 N.J. 127 (1978); State v. Brunson, 132 N.J. 377 (1993).

[5]  State v. Driver, 38 N.J. 255 (1962); Miranda v. Arizona, 384 U.S. 436 (1966).

13

Capers was sentenced on February 16, 2001, under the No Early Release Act, N.J.S.A. 2C:43-7.2, to an aggregate prison term of 38 years with an 85% parole ineligibility period.  He also was sentenced to lifetime community supervision under Megan's Law, N.J.S.A. 2C:7-2.  The court further ordered that petitioner "be transferred to the Adult Diagnostic and Treatment Center ("ADTC") for Specialized Sexual Offenders Therapy at such time as he may be eligible for treatment, prior to being released from prison."  (Rta7 at 45:7-11; Ra5).

Capers filed a direct appeal on or about May 7, 2001. (Ra7).  The Superior Court of New Jersey, Appellate Division affirmed the conviction and sentence in an Opinion filed on May 1, 2003.  (Ra13).  The Supreme Court of New Jersey denied certification on July 17, 2003.  (Ra29).

Thereafter, on or about November 12, 2003, Capers filed his first petition for post-conviction relief ("PCR") in state court. (Ra21).  On December 16, 2005, Judge Natal, who had presided over Capers' criminal trial and sentencing, conducted a hearing on the PCR petition and denied petitioner relief.  (Rta8; Ra23).  It does not appear that Capers appealed from denial of his PCR petition.

14

Capers filed this amended federal habeas petition on or about January 11, 2006.[6]  Respondents filed their answer and provided the relevant state court record on March 27, 2006.  The State also filed on the same date, a motion to dismiss the petition and a motion to seal documents.  (Docket Entry Nos. 15 & 16, respectively).[7]  The Court granted the motion to seal documents by Order filed on April 6, 2006.  (Docket Entry No. 18).  Thereafter, Capers filed several motions and supplemental exhibits as follows.  On May 4, 2006, petitioner filed a motion for habeas relief.  (Docket Entry No. 20).  On July 28, 2006, Capers filed a motion for an emergency hearing, and on August 31, 2006, petitioner filed a motion to dismiss certain offenses charged in the state court indictment.  (Docket Entry Nos. 26 and 32, respectively).  The State filed responses in opposition to petitioner's various motions and exhibits.  The Court will consider petitioner's motions, pursuant to Fed.R.Civ.P. 78.

---

[6]  Capers filed his habeas petition on or about March 15, 2005, and his first amended petition on March 21, 2005.  It now appears that Capers filed his initial federal habeas petition and first amended petition before his state PCR petition had been decided by Judge Natal on December 16, 2005.  On December 7, 2005, this Court dismissed the first amended petition as deficient, but granted Capers leave to file another amended petition so as to cure the stated deficiencies.  Capers filed his second amended petition (Docket Entry No. 8) on January 11, 2006.

[7]  Respondents' motion to dismiss the habeas petition (Docket Entry No. 15) is rendered moot by this Court's decision to deny the petition on the merits.

15

## II.   STATEMENT OF CLAIMS

In his amended petition, Capers raises the following claim:

Ground One: Unlawful Conviction/Commitment made by prosecutor under an unconstitutional statute and violates the due process and equal protection under the Constitution.

(a) Supporting Facts: On 12-05-00 [t]he prosecutor charge petitioner with two offenses under N.J.S.A. 2C:14-6.   On 12-13-00 the prosecutor offered petitioner a plea agreement to dismiss the offenses if petitioner will agree to stop the trial before the "victim" testify and accept a 15 years 85% prison sentence.   Petitioner refuse the plea agreement offered by the prosecutor as no "victim" or witnesses testified at trial to the offenses charge under the statute by the prosecutor which the trial jury found petitioner guilty of the offenses.   Thereafter, the court order petitioner to undergo testing at A.D.T.C..   And, on 12-23-00 the court sentence the petitioner without notice or a hearing on the offences.   Exhibit#1 (sic).   On 3-02-01 petitioner was admitted in Camden County jail and taken in custody to A.D.T.C. and place in detention without notice or a hearing on the charges.

(Amended Petition (Docket Entry No. 8) at pg. 6, Ground One).

The State filed an answer to the petition, asserting that the claim raised by Capers is unexhausted, procedurally defaulted, fails to state a federal constitutional deprivation, and/or is without merit.

As stated above, petitioner also filed several motions seeking habeas relief based on allegations that the State failed to provide a complete and accurate state court record in response to the petition.   Because these motions specifically seek petitioner's release from prison, they are discussed below as part of this Court's review of Capers' habeas petition.

16

A.  Motion for Habeas Relief (Docket Entry Nos. 20, 23 & 33)

On May 4, 2006, Capers filed a motion for habeas relief in which he denies most, if not all, of the answer submitted by respondents.  He claims he has no knowledge of the October 26, 1999 grand jury transcript and the January 2000 ADTC Evaluation Report.  Further, Capers alleges that the respondents did not provide a complete copy of the state court record.  Based on these claims, Capers contends that he should be released from prison.  In support of his motion, Capers attaches certain documents, namely, a letter dated July 19, 2004 from the Clerk of the Superior Court of New Jersey, Appellate Division concerning Capers' motion for reconsideration of his sentence; a Pennsauken Police Department complaint/warrant concerning an attempt to commit burglary on June 11, 1999; and a Cherry Hill Police Department complaint/warrant related to the offenses which are the subject of Capers' conviction under habeas review.  (Docket Entry No. 23).[8]

---

[8]  Capers submitted another letter, dated August 29, 2006, (Docket Entry No. 33), in which he refers to his motion for habeas relief (Docket Entry No. 20).  He claims that the respondents failed to provide a "true" and complete copy of the state court record, and suggests that the respondents' answer is not accurate.  To demonstrate this claim of inaccuracy, Capers states that the judgment of conviction was entered on February 20, 2001, and that his notice of appeal was filed on May 5, 2001, in contrast to the dates asserted by the State in its answer and the record.  Capers attaches a non-conformed copy of the notice of appeal filed to confirm this allegation.  The Court finds no inaccuracy in the record provided by the State.  On page one of the Judgment of Conviction and Order of Commitment, it states

The State responded to petitioner's motion by letters filed on May 12, 2006 and June 13, 2006. (Docket Entry Nos. 21 & 24). Respondents contend that petitioner's motion is baseless as respondents have filed a complete state court record relevant to the disposition of this matter. Further, respondents argue that the motion should be denied because Capers has failed to set forth a basis for habeas intervention.

Having reviewed the submissions by the parties, this Court will deny Capers' motion because petitioner has demonstrated no basis to support habeas relief on the grounds asserted.

B. <u>Motion for An Emergency Hearing (Docket Entry Nos. 26 & 29)</u>

On July 25, 2006, Capers filed a motion for an emergency hearing (Docket Entry No. 26), again seeking his immediate release from the ADTC on the ground that respondents failed to provide a full and complete copy of the state court records as

---

that, "It is therefore, on 02/16/01 ORDERED and ADJUDGED that the defendant is sentenced as follows:" Further, Judge Natal attached his statement of reasons for Capers' sentence to the judgment of conviction, and this is dated February 16, 2001. (Ra5). However, Capers references the February 20, 2001 date shown on page 3, at the signature line on the form. (Ra5). <u>See</u> <u>N.J.Ct.R.</u> 3:21-5(b), Comment 1, "judgment occurs only upon signing and entry of sentencing order." In any event, both petitioner and respondents refer to the same document, and the difference in the date referenced is inconsequential. Moreover, the judgment of conviction was amended on March 13, 2001. (Ra6). As to the May 5, 2001 filing date of the notice of appeal, the Court notes that May 5, 2001 was the date counsel signed the notice of appeal. However, the notice of appeal actually was filed on May 7, 2001, as indicated by the conformed copy submitted by respondents with the state court record. (Ra7).

required under Fed.R.Crim.P. 11.1(c), (d) and N.J.Ct.R. 3:7-2, 3. In his motion papers, Capers reiterates his denial of most, if not all, of the answer submitted by respondents to the § 2254 habeas petition. He also repeats his claim he had no knowledge or possession of certain documents or information asserted by the State in response to the federal habeas petition. For instance, Capers claims that he did not know of or consent to a January 18, 2000 plea agreement, the Indictment No. 3380-10-99 returned by the Camden County Grand Jury on October 26, 1999, the appeal filed on his behalf regarding his state court conviction, the ADTC evaluation report, and his Adult Presentence Report.

The State responded to Capers' motion, asserting that an answer to the petition was filed on March 27, 2006, and a full and complete record relevant to the disposition of the petition was submitted to the Court. Further, respondents dispute Capers' assertions that he had no knowledge of the aforesaid documents or events, claiming that the record, as provided, demonstrates petitioner's knowledge. Respondents also state that the relevant record was provided to petitioner, and that Capers' exhibits attached to a letter submission in support of his motion (Docket Entry No. 29) are not relevant to the disposition of the petition.[9]

---

[9] For instance, Capers attaches a statement by George Gaston, who was not called as a witness at trial. Capers does not indicate any basis upon which to consider the Gaston

19

This Court finds no merit to Capers' request to be released from confinement based on alleged shortcomings in the State's answer and the state court record provided. The court rules relied upon by Capers in his motion pertain to federal and state criminal proceedings and not a federal habeas proceeding, which is a civil proceeding governed by the Federal Rules of Civil Procedure and the Rules Governing Habeas Corpus Cases Under Section 2254 ("Habeas Rules"). The Court finds that the State's response and the submission of the relevant state court record are in compliance with the pertinent Federal Rules of Civil Procedure and with Habeas Rule 5.

Moreover, the State timely responded to the petition and provided to this Court the relevant state court record necessary for disposition of the issues asserted in Capers' habeas petition. Documents filed in state court are conformed copies, which verify the accuracy of the dates when they were filed, and the transcripts clearly support the facts as argued by respondents in their answer to the petition. It also is clear that respondents provided a copy of the pertinent record to petitioner.

---

statement and its relevance to the disposition of the habeas petition. Indeed, the Court notes that the statement is mostly detrimental to Capers. Capers also attaches documents which were already provided by the respondents as part of the relevant state court record in this matter.

Therefore, the Court will deny petitioner's motion for an emergency hearing (Docket Entry Nos. 26 and 29) because Capers fails to show any valid basis for granting his release from prison.

C.   Motion to Dismiss Offenses Under N.J.S.A. 2C:14-2A(6)

On August 31, 2006, Capers filed a motion to dismiss the offenses under N.J.S.A. 2C:14-2a(6) on the ground that he received no notice of these charges and there was no return of an indictment by the grand jury on these charges.  (Docket Entry No. 32).  The State filed an opposition letter (Docket No. 34), asserting that this issue is more fully addressed in its response to the habeas petition.  Further, the State claims that the grand jury transcript (Ra-GJ), as well as other portions of the state court record, contradicts Capers' assertion that he was not noticed or indicted on charges of aggravated sexual assault under N.J.S.A. 2C:14-2a(6).  Finally, the State disputes that there are any inaccuracies in the state court record provided, as alleged by Capers.

For the reasons stated in this Opinion below, the Court finds that there is no basis for Capers' motion to dismiss the N.J.S.A. 2C:14-2a(6) offenses.  The state court record plainly negates Capers' assertion that he did not receive notice or was not indicted under N.J.S.A. 2C:14-2a(6).  Therefore, the motion is denied.

21

### III.   EXHAUSTION & PROCEDURAL DEFAULT DOCTRINES

### A.   Exhaustion Requirement

The exhaustion and procedural default doctrines are often confused because they operate in tandem to protect the integrity and independence of state judicial systems.  First, pursuant to the exhaustion doctrine, a federal court shall not *grant* a writ of habeas corpus on behalf of an individual in custody pursuant to a state court judgment unless "the applicant has exhausted the remedies available in the state courts."  28 U.S.C. § 2254(b)(1). In order to exhaust state court remedies, a habeas petitioner must show that he "fairly presented" his claims to the state courts by "invoking one complete round of the State's established appellate review process."  Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999)).[10]

If a habeas petitioner has not "fairly presented" his claims to the state courts and it is still possible for him to raise those claims in a state court proceeding, the claim is unexhausted.  See, e.g., 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he

_____

[10]   In Carpenter, the court applied the pre-AEDPA version of § 2254 because Carpenter filed his habeas petition before AEDPA went into effect.  Carpenter, 296 F.3d at 149 n.12.  This does not affect the court's thorough discussion of the exhaustion and procedural default doctrines as they relate to this matter.

has the right under the law of the State to raise, by any available procedure, the question presented."); Carpenter, 296 F.3d at 146 (stating that a habeas claim is unexhausted where petitioner has not fairly presented the claim in state court and it remains possible for him to do so). If the state law clearly forecloses review of a claim which has not been fairly presented to the state courts, a federal court entertaining a habeas petition will hear the claim despite petitioner's failure to fairly present the claim in state court, unless the claim is procedurally defaulted. See 28 U.S.C. § 2254(b)(1)(B)(I); Carpenter, 296 F.3d at 146.

Nevertheless, even if the habeas claims were not exhausted, this Court observes that, pursuant to 28 U.S.C. § 2254(b)(2), it has the authority to deny the habeas petition on the merits even if petitioner failed to exhaust the remedies available to him in state court. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); see also Duncan v. Walker, 533 U.S. 167, 203 n.6 (2001)(noting that under § 2254(b)(2), a district court may deny non-exhausted, non-meritorious claims); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003)(same). Because this Court finds that petitioner's claim for habeas relief is utterly without merit, the Court will review the petition under

§ 2254(b)(2) and deny the petition accordingly.

B.  Procedural Default

The State also argues that the petition is procedurally defaulted.  A procedural default occurs when a habeas petitioner's federal claim is "barred from consideration in the state courts by an 'independent and adequate' state procedural rule."  See, e.g., Carpenter, 296 F.3d at 146; Doctor v. Walters, 96 F.3d 675, 683 (3d Cir. 1996).  On habeas review of state prisoner claims, a federal court "will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'"  Coleman v. Thompson, 501 U.S. 722, 734-35 (1991)(quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); see also Harris v. Reed, 489 U.S. 255, 266 (1989) (holding that habeas claim was not procedurally defaulted where state court did not clearly and expressly rely on procedural bar as ground for rejecting the claim).[11]  Only a "firmly established and regularly followed state practice" is adequate to prevent subsequent habeas review in federal court.

---

[11] A state court's reliance on a procedural bar as an alternate holding is sufficient to trigger the "cause" and "prejudice" test.  See United States ex rel. Caruso v. Zelinsky, 689 F.2d 435, 440 (3d Cir. 1982).

24

James v. Kentucky, 466 U.S. 341, 348-351 (1984).  See also Lee v. Kemna, 534 U.S. 362, 376 (2002) ("Ordinarily, violation of 'firmly established and regularly followed' state rules ... will be adequate to foreclose review of a federal claim." (citations omitted)).  Generally speaking, "[a] state court's refusal to address a prisoner's federal claims because he has not met a state procedural requirement is both independent and adequate." Cabrera v. Barbo, 175 F.3d 307, 312 (3d Cir. 1999) (citations omitted).

Finally, if it is determined that a claim is procedurally defaulted, a federal court may only entertain such claim on habeas review if the petitioner shows either cause to excuse the default and prejudice resulting from the default or that a fundamental miscarriage of justice will result should the federal court fail to hear petitioner's claim.  See, e.g., Coleman, 501 U.S. at 750.

The "cause" standard requires a petitioner to show that some objective factor external to the defense impeded his efforts to comply with the state procedural rule.  See Coleman, 501 U.S. at 752 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)).  In the absence of a Sixth Amendment violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of the representation.  Coleman, 501 U.S. at 754.  Neither a pro se prisoner's ignorance of the procedural rule nor inadvertence

25

satisfies the cause standard.  Murray at 485-87.  Failure of the state court to "bend the rules" for a pro se litigant is not cause.  Caswell v. Ryan, 953 F.2d 853, 862 (3d Cir. 1992).

To establish "prejudice," a petitioner must prove "'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension.'"  Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).  In the context of an ineffective assistance claim, the Court of Appeals for the Third Circuit has held that prejudice occurs where "there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."  Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996).

In the alternative, in order to establish that failure to review an otherwise procedurally defaulted claim will result in a "miscarriage of justice," a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Carrier, 477 U.S. at 496.  "Thus, to establish a miscarriage of justice, the petitioner must prove that it is more likely than not that no reasonable juror would have convicted him."  Werts, 228 F.3d at 193 (citing Schlup v. Delo, 513 U.S. 298, 326 (1995)).

26

Here, the Court finds that the claim raised in Capers' state PCR proceedings is not procedurally barred, as asserted by the State. It is clear from the December 16, 2001 transcript of the state court PCR proceedings (Rta8) that the trial judge did not rely on the application of the state procedural bars under N.J. Court R. 3:22-4 when the court denied the PCR petition, including the double jeopardy claim involving the issue of Counts 2 and 6 of the original indictment being dismissed before the jury was impaneled and sworn at trial, and the ineffective assistance of counsel claim regarding the failure of counsel to file pretrial motions to dismiss the indictment.

Moreover, to the extent that the claim now raised by petitioner here is not related to the claim asserted by petitioner in his state PCR motion, it is unexhausted and there is no indication that the state court would dismiss a new PCR motion as procedurally barred. Thus, at worst, the petition is unexhausted and this Court may review the habeas claim asserted, pursuant to 28 U.S.C. § 2254(b)(2) for dismissal on the merits. Therefore, this Court finds that the petition is not procedurally defaulted and the Court will now adjudicate the habeas claim raised in Ground One of the amended petition pursuant to 28 U.S.C. § 2254(b)(2).

IV.   STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).  Because petitioner is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on
> behalf of a person in custody pursuant to the judgment
> of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim -

> (1)   resulted in a decision that was contrary to, or
>        involved an unreasonable application of, clearly
>        established Federal law, as determined by the
>        Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an
>        unreasonable determination of the facts in light
>        of the evidence presented in the State court
>        proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the Supreme
Court explained that subsection (d)(1) involves two clauses or
conditions, one of which must be satisfied before a writ may
issue.  The first clause, or condition, is referred to as the
"contrary to" clause.  The second condition is the "unreasonable
application" clause.  <u>Williams</u>, 529 U.S. at 412-13.  In the
"contrary to" clause, "a federal court may grant the writ if the
state arrives at a conclusion opposite to that reached by [the
Supreme] Court on a question of law or if the state court decides
a case differently than [the Supreme] Court has on a set of
materially indistinguishable facts."  <u>Id</u>.  Under the
"unreasonable application" clause, a federal court may grant the
writ if "the state court identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of [the petitioner's] case."
<u>Id</u>. at 413.  Habeas relief may not be granted under the

29

"unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief. Id. at 411. See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims. First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims. See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891. If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision. Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result. Id. AEDPA prohibits such de novo review. Rather, the federal habeas court must determine whether the state

30

court's application of the Supreme Court precedent was objectively unreasonable.  Id.  In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538 U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28

31

U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  <u>Mastracchio v. Vose</u>, 274 F.3d 590, 597-98 (1st Cir. 2001).

## V.   ANALYSIS

Petitioner asserts generally that his conviction and sentence are unlawful because he was denied due process and equal protection under the U.S. Constitution.  To support this claim, Capers alleges (1) that, on December 5, 2000, the prosecutor charged petitioner with two counts under <u>N.J.S.A.</u> 2C:14-6; (2) that, on December 13, 2000, the prosecutor made a plea offer to dismiss those two counts if petitioner would agree to stop trial before the victim testifies and accept a 15-year prison term with an 85% parole ineligibility period; (3) that no witnesses or the victim testified at trial to the offenses charged under the statute; (4) that, on December 23, 2000, the trial court sentenced petitioner without notice or hearing on the offenses; and (5) that, on March 2, 2001, petitioner was placed in detention without notice or hearing on the charges.

Based on review of the state court record, this Court finds that Capers' allegations are factually inaccurate and/or are without any substantive merit.

32

A.   Charges Under N.J.S.A. 2C:14-6

This first allegation is completely erroneous.  On December
5, 2000, before trial began, the prosecutor made a motion to the
trial court to amend the indictment to reflect the appropriate
statutory violation on the first degree aggravated sexual assault
charges.  Namely, the indictment was amended to change Counts 4
and 8 of the original indictment to read as violations of
N.J.S.A. 2C:14-2a(6) rather than N.J.S.A. 2C:14-2a(3).  Those
counts were then renumbered in the amended indictment to be
Counts 2 and 4, respectively.  Nowhere in the original indictment
or in the amended indictment is petitioner charged with a
violation of N.J.S.A. 2C:14-6, which is a sentencing statute that
provides for the imposition of a mandatory parole disqualifier as
part of any sentence imposed on a defendant convicted of a second
or subsequent offense under N.J.S.A. 2C:14-2 or 2C:14-3a.
Therefore, this claim lacks factual merit, and habeas relief as
to this allegation will be denied.

To the extent that Capers may be challenging the imposition
of an 85% parole disqualifier, the claim also is subject to
dismissal because Capers does not allege a cognizable claim of
federal constitutional deprivation.  Sentencing is generally
considered a matter of state criminal procedure, which does not
fall within the purview of federal habeas review.  United States
v. Cepero, 224 F.3d 256, 267 (3d Cir. 2000), cert. denied, 531

U.S. 1114 (2001); Ervin v. Beyer, 716 F. Supp. 163, 165 (D.N.J. 1989); Grecco v. O'Lone, 661 F. Supp. 408, 415 (D.N.J. 1987). Indeed, absent some constitutional violation, federal courts cannot review a state's alleged failure to adhere to its own sentencing procedure. Rorie v. Beard, Civ.A.No. 04-3380, 2005 WL 825917, *5 (E.D. Pa. April 7, 2005)(citing Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988)). Thus, a federal court will not reevaluate a sentence in a habeas proceeding unless it exceeds the statutory limits. Jones v. Superintendent of Rahway State Prison, 725 F.2d 40 (3d Cir. 1984); see also Williams v. Duckworth, 738 F.2d 828, 831 (7th Cir. 1984), cert. denied, 469 U.S. 1229 (1985)("As a general rule, federal courts will not review state sentencing determinations that fall within statutory limits."); Bonner v. Henderson, 517 F.2d 135, 136 (5th Cir. 1975)("This Court will not upset the terms of a sentence within statutory limits unless so disproportionate to the offense as to be completely arbitrary and shocking").

Moreover, federal courts will not interfere with a state's sentencing scheme unless the petitioner can show that no reasonable sentencing court would have found the aggravating factors necessary to justify imposition of the sentence. Lewis v. Jeffers, 497 U.S. 764, 783 (1990). "While normal sentencing proceedings are not immune from all due process attacks, the Supreme Court has required only minimal due process protections

in those proceedings." United States v. Davis, 710 F.2d 104, 106 (3d Cir.), cert. denied, 464 U.S. 1001 (1983)(citations omitted).

Here, petitioner has not demonstrated that his sentence violates any federal constitutional rights. First, Capers' sentence plainly does not exceed the statutory limits of the offenses for which he was convicted; nor does the sentence shock the judicial conscience as even remotely excessive. See Harris v. United States, 536 U.S. 545, 557 (2002); Wainwright v. Goode, 464 U.S. 78, 84 (1983). Second, the sentencing transcript shows that the trial judge carefully weighed and considered the mitigating and aggravating factors to support the imposition of a mandatory parole disqualifier. (RTa7 at 38:5-45:21). Finally, the record shows that petitioner was aware that a mandatory parole disqualifier may be imposed as this was generally discussed at pretrial proceedings, when referring to plea negotiations, on August 4, 2000. (Rta1 at 14:5-23). Thus, this claim lacks substantive merit, and is not subject to federal review because it does not demonstrate a violation of a federal constitutional right.

B.  Plea Agreement

Next, Capers alleges that the prosecutor offered a plea agreement to have petitioner accept a 15-year prison term with an 85% parole disqualifier if he would stop the trial before the victim testified. Capers refused the plea offer, and now states

35

that no witness or victim testified at trial as to the offenses charged under the indictment.

Respondents counter that no such plea offer was made as alleged by Capers.  The state court record shows that, at a pretrial hearing on August 4, 2000, the prosecutor discussed a plea offer tendered by the State on December 14, 1999, which was rejected as petitioner did not want to plead guilty.  (Rta1 at 7:11-16).  The court then questioned petitioner as to his interest in engaging in plea negotiations, and Capers responded that he was not interested in a plea offer.  (Rta1 at 14:1-15:8).  No further plea offers were discussed after the August 4, 2000 hearing.

Moreover, the trial record shows that the victim testified at length regarding the facts giving rise to the charges against Capers.  (Rta3 at 97:13-195:25).

Therefore, this Court finds that petitioner's allegations on this claim also are factually inaccurate and fail to provide any factual or legal basis for habeas relief.  The claim will be denied for lack of merit accordingly.

C.  Sentencing and ADTC Evaluation Without Notice or Hearing

It also appears from petitioner's supporting facts under Ground One of the petition that he was allegedly sentenced without notice or hearing on December 23, 2000, and that he was

36

ordered to undergo testing at the ADTC.  Again, the state court
record contradicts these allegations.

Capers was evaluated at the ADTC on December 22, 2000 and
the examining physician found that petitioner was eligible for
sentencing under the New Jersey Sex Offender Act.  Additionally,
Capers told the examining physician that he wanted to be treated
at the ADTC.  (Ra-PSR/A.D.T.C., submitted under seal).
Thereafter, Capers appeared for sentencing with his counsel, on
February 16, 2001.  At the sentencing hearing, defense counsel
acknowledged that he read the ADTC evaluation report, discussed
it with Capers, and that Capers did not wish to contest the
findings.  (Rta7 at 2:10-17).  Thus, it is clear that Capers had
an opportunity to review and challenge the ADTC report and that
he had notice of and a hearing on his sentencing.  This claim
will be denied for lack of merit.

D.   ADTC Detention Without Notice or Hearing

The last allegation made by Capers in his amended petition
at Ground One, claims that he was taken into custody at the ADTC
on March 2, 2001 without notice or hearing.  This claim is
completely meritless.  A sentencing hearing was held on February
16, 2001 and the court heard argument and considered the
mitigating and aggravating factors for sentencing.  (Rta7; Ra5).
In particular, the court ordered that Capers "may be transferred
to the Adult Diagnostic and Treatment Center for specialized

37

sexual offender treatment at such time as he is eligible for treatment prior to his release from prison." (Rta5). Moreover, at his ADTC evaluation on December 22, 2000, he related to the examining physician that he wanted to be treated at the ADTC because of his sexual behavior problems and underlying psychological disorder. (Ra-PSR/A.D.T.C., submitted under seal).

Therefore, this claim will be denied because petitioner has not demonstrated any factual or legal basis for habeas relief.

E.   No Notice or Indictment Under N.J.S.A. 2C:14-2a(6)

Finally, Capers now argues, in his motion filed on August 31, 2006 (Docket Entry No. 32), that his convictions under N.J.S.A. 2C:14-2a(6) should be dismissed because he did not receive notice of these charges before trial, nor was he indicted under this statutory offense.

This claim is completely unsupported by the state court record. As stated above, the original indictment was amended on December 5, 2000, before trial, to change reference to the statutory offenses set forth in original Counts 4 and 8/amended Counts 2 and 4 from N.J.S.A. 2C:14-2a(3) to N.J.S.A. 2C:14-2a(6). The original Count 4 charged that petitioner "did commit an act of sexual penetration upon [Y.J.] by [petitioner] performing anal penetration upon said victim using physical force and the victim sustained severe personal injury contrary to the provisions of

38

N.J.S.A. 2C:14-2a(3), and against the peace of this State, the Government and dignity of same." (Ra1). Likewise, the original Count 8 charged that petitioner "did commit an act of sexual penetration upon [Y.J.] by [petitioner] performing vaginal penetration upon said victim using physical force and the victim sustained severe personal injury contrary to the provisions of N.J.S.A. 2C:14-2a(3), and against the peace of this State, the Government and dignity of same." (Ra1).

The language of the original indictment Counts 4 and 8 tracks the very same language as set forth in N.J.S.A. 2C:14-2a(6). Moreover, the acts of petitioner as alleged under these original counts in the indictment plainly put Capers on notice of the crimes for which he was charged, namely, the anal and vaginal penetration of victim by use of physical force causing the victim to sustain severe personal injury. Further, it is clear from reading the transcript of the grand jury proceedings that petitioner was indicted for these statutory offenses. (Rta-GJ).

In fact, the prosecutor carefully explained to the grand jury the elements of each offense charging petitioner with aggravated sexual assault by sexual penetration. The prosecutor noted the two different charges of sexual penetration, by vaginal penetration and by anal penetration. Then, the prosecutor distinguished for the grand jury the four different charges of aggravated sexual assault by vaginal penetration (1) during the

commission of an aggravated sexual assault, (2) during the commission of a kidnaping, (3) during the commission of a robbery, and (4) by use of physical force causing the victim to sustain severe personal injury.  The prosecutor repeated each of these four counts for the acts of aggravated sexual assault by anal penetration for a total of eight counts of aggravated sexual assault by sexual penetration.  (Ra-GJ at 4:2-5:18; 25:17-27:7).

Thus, the language in the original indictment, and the specific reference to the statute, N.J.S.A. 2C:14-2a(6), in the indictment as amended pretrial, plainly put Capers on notice of the exact charges against him because the factual allegations in the counts at issue set forth the acts and elements of the offenses in detail and track almost verbatim the language of the statute itself.  Therefore, the Court finds no substantive merit to Capers' claim that he received no notice of these charges or that he was not indicted on these statutory offenses.  Capers is not entitled to habeas relief on this ground and it will be denied accordingly.

## VI.  CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of appealability should issue.  See Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For

the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

### CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  An appropriate Order follows.

NOEL L. HILLMAN
United States District Judge

Dated: September 28, 2006
in Camden, New Jersey

41